

IN THE UNITED STATES DISTRICT COURT FOR

THE WESTERN DISTRICT OF OKLAHOMA

FEB 1 0 2010

ROBERT D. DENNIS, CLERK
U.S. DIST. COURT, WESTERN DIST. OF OKLA.
BY _Yuk_____ DEPUTY

JERRY L. THOMAS,                    )
                                    )
        Plaintiff,                  )
                                    )
vs.                                 )        No. CIV-08-1338-W
                                    )
KATRYNA FRECH et al.,               )
                                    )
        Defendants.                 )

## ORDER

On October 26, 2009, United States Magistrate Judge Gary M. Purcell issued a

Supplemental Report and Recommendation in this matter and recommended that the

Motion to Dismiss/Motion for Summary Judgment filed by the remaining sixteen (16)

defendants, Ron Anderson, Genese McCoy, Sandra Clepper, Allen Shaw, David Parker,

Amber Chester, Jeff Troutt, M.D., Rodney Redman, Robert Denton, Jo Gwinn, Becky

Guffy, Katryna Frech, Bill Myers, Don Frech ("D. Frech"), William Irvin and Traver

Deweese, be construed as seeking relief under Rule 56, F.R.Civ.P., and be granted as to

the remaining unresolved counts. Magistrate Judge Purcell also recommended that the

Court dismiss this matter without prejudice as to defendant Roy Arian.

The parties were advised of their right to object, and the matter now comes before

the Court on the Objections to Supplemental Report and Recommendation [Doc. 62] filed

by plaintiff Jerry L. Thomas.

Thomas, proceeding pro se, commenced this action on December 9, 2008, and

asserted thirteen (13) counts against eighteen (18) correctional officials. He amended his

complaint on February 17, 2009, and named as defendants in their individual capacities

twenty-four (24) correctional officers in twenty (20) counts. The defendants were either employees at James Crabtree Correctional Center ("JCCC"), where Thomas was incarcerated at the time he filed this lawsuit, or officials of Oklahoma Department of Corrections ("DOC" or "ODOC").[1]

On April 27, 2009, the Court adopted the Report and Recommendation issued by Magistrate Judge Purcell on March 13, 2009, and dismissed without prejudice Thomas' claims as set forth in Counts II, VII, VIII, IX, XIII, XV, XVI, XVII and XX.[2] The Court also dismissed without objection and without prejudice Counts V, XI, XVIII and XIX.

In the instant Motion to Dismiss/Motion for Summary Judgment, the defendants have contended that they are entitled to dismissal of, or judgment on, Thomas' remaining counts: Counts I, III, IV, VI, X, XII and XIV. They have argued as to all counts except Count X that Thomas has failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act of 1995 ("PLRA"), as amended, 42 U.S.C. § 1997e et seq., and as to Count X, that Thomas has failed to state a claim upon which relief be granted.

In determining whether summary judgment is appropriate as to any one defendant, the Court must decide whether "there is no genuine issue as to any material fact and . . .

---

[1] In his amended complaint Thomas has named the following defendants and identified their positions at JCCC or DOC: Katryna Frech (Correctional Health Services Administrator), David Parker (Warden), Jeff Troutt, M.D. (Physician), Roy Arian (Physician Assistant), Bill Myers (Security Captain), Don Frech (Security Lieutenant), Traver Deweese (Security Officer), Sandra Clepper (Nurse), Amber Chester (Nurse), Becky Guffy (Warden's Assistant), William Irvin (Security Lieutenant), Jo Gwinn (Unit Manager), Robert Denton (Chief of Security), Rodney Redman (Deputy Warden), Allen Shaw (Security Officer), Genese McCoy (DOC Medical Services Administrator) and Ron Anderson (DOC Assistant General Counsel).

[2] Also named in the amended complaint as defendants were JCCC "Nurse Robin," JCCC Deputy Warden Janet Dowling, JCCC Disciplinary Officer Susie Salinas, JCCC Nurse Chance Cell, JCCC "Nurse Sharon," JCCC Law Librarian Felicia Harris and JCCC Case Manager Denaye Prigmore. They have been dismissed from the action.

[whether the defendant then under consideration] is entitled to judgment as a matter of law." Rule 56(c)(2), F.R.Civ.P. The Court at this stage of the litigation does not evaluate the credibility of the witnesses, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), or "weigh the evidence and determine the truth of the matter . . . ." Id. at 249. Rather, the Court must decide "whether there is a genuine issue for trial . . . [and] there is no [triable] issue . . . unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (citations omitted). The Court's inquiry must be whether the evidence, when viewed "through the prism of the substantive evidentiary burden," id. at 254, "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52. In making this determination, the Court must "'examine the record and all reasonable inferences that might be drawn from it in the light most favorable to [Thomas,] the non-moving party.'" Pinkerton v. Colorado Department of Transportation, 563 F.3d 1052, 1058 (10th Cir. 2009)(quoting T-Mobile Central, LLC v. Unified Government of Wyandotte County, 546 F.3d 1299, 1306 (10th Cir. 2008)(citations ornitted)).

Furthermore, in applying these standards to test an affirmative defense that would entitle a defendant to summary judgment, the Court is mindful that the defendant

> must demonstrate that no disputed material fact exists regarding the affirmative defense asserted. If the defendant meets this initial burden, the plaintiff must then demonstrate with specificity the existence of a disputed material fact. If the plaintiff fails to make such a showing, the affirmative defense bars his claim, and the defendant is then entitled to summary judgment as a matter of law.

Hutchinson v. Pfeil, 105 F.3d 562, 564 (10th Cir. 1997)(citations omitted).

The PLRA, upon which the instant defendants have relied, provides in relevant part that "[n]o action shall be brought with respect to prison conditions . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[E]xhaustion is mandatory under the PLRA," Jones v. Bock, 549 U.S. 199, 211 (2007), and because PLRA exhaustion is an affirmative defense, e.g., id. at 216, the burden is on the defendants to prove that Thomas has failed to exhaust all available administrative remedies. E.g., Roberts v. Barreras, 484 F.3d 1236, 1241 (10th Cir. 2007).

> [T]o properly exhaust administrative remedies prisoners must "complete the administrative review process in accordance with the applicable procedural rules"–rules that are defined not by the PLRA, but by the prison grievance process itself. Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to "properly exhaust." The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.

Jones, 549 U.S. at 218 (quoting Woodford v. Ngo, 548 U.S. 81, 88 (2006)).

ODOC requires inmates prior to filing a lawsuit to timely and properly complete four (4) steps to administratively exhaust the "Inmate/Offender Grievance Process" outlined in OP-090124.[3] Section IV of OP-090124 outlines the two (2) informal steps. First, the inmate must try to resolve his complaint by talking with the appropriate staff member within three (3) days of the incident. OP-090124, Section IV(A). If the complaint is not resolved, the inmate must proceed to step two and must submit within seven (7) calendar days a

---

[3]The Court has cited to the Inmate/Offender Grievance Process submitted in the defendants' Special Report [Doc. 47-19], which became effective May 3, 2007. The Court is aware that ODOC has promulgated a revised "Offender Grievance Process," with an effective date of September 8, 2009.

"Request to Staff" ("RTS")[4] to the appropriate staff member, "stating completely but briefly the problem." Id. Section IV(B).

Section V of OP-090124 outlines the submission and review of formal grievances. If the complaint is not resolved informally, the inmate may complete and submit to the reviewing authority[5] an "Inmate/Offender Grievance Report Form" within fifteen (15) calendar days of the incident or the date of the response to the Request to Staff together with the Request to Staff used in the informal process and the response thereto. Id. Section V(A).

> If the inmate/offender does not follow instructions as explained in . . . [OP-090124] and on the grievance forms, the grievance may be returned unanswered for proper completion. If allowed, the inmate/offender must properly re-submit the grievance . . . [and] [c]ontinued failure to follow instructions may result in restrictions being imposed . . . .

Id. Section V(A)(7).

"The reviewing authority will screen the grievance to determine . . . [w]hether the grievance and 'Request to Staff' form were submitted in a timely manner[ and] . . . [w]hether the instructions for submitting a grievance were followed," id. Section VI(A)(2)(c)-(d), and respond. At step four of the grievance process, the inmate may appeal the reviewing authority's response to the administrative review authority or chief medical

---

[4]Pursuant to DOC OP-140106, Section 1(C), Request to Staff forms labeled "DOC 090124D," are "maintained in accordance with OP-090124 . . . ."

[5]OP-090124, Section I(D) defines "reviewing authority" as "[t]he facility head or facility correctional health services administrator (CHSA) where the incident occurred and to whom the grievance is first submitted." OP-090124, Section V(5) requires "[a]ll medical grievances [to] . . . be submitted to the facility correctional health services administrator for resolution."

officer.[6] Id. Section VII(B). Obtaining a final ruling from the administrative review authority or chief medical officer completes the DOC's exhaustion process. Id. Section VII(D)(1).

Section IX of the Inmate/Offender Grievance Process as set forth in OP-090124 pertains to abuse of the grievance process. Section IX(B) outlines the restriction process, and Section IX(B)(1) provides that a restriction "may be imposed for a period not longer than 12 months," but that "[f]urther abuses are grounds for extending the restriction."

As stated, the inmate "must 'complete th[is] administrative [grievance] . . . process in accordance with the [prison's] applicable procedural rules.'" Jones, 549 U.S. at 218 (quoting Woodford, 548 U.S. at 88). "'An inmate who begins the grievance process but does not complete it is barred from pursing a [federal] claim under the PLRA for failure to exhaust his administrative remedies.'" Fields v. Oklahoma State Penitentiary, 511 F.3d 1109, 1112 (10th Cir. 2007)(quoting Jernigan v. Stuchell, 304 F.3d 1030, 1032 (10th Cir. 2002)). "[S]ubstantial compliance [with the prison's grievance procedures] is insufficient." Id. (citation omitted).

The United States Court of Appeals for the Tenth Circuit has "examine[d] the plain meaning of the term 'available' in [section] 1997e(a) and [has found] . . . that a prisoner is only required to exhaust those procedures that he . . . is reasonably capable of exhausting." Hoover v. West, 93 Fed. Appx. 177, 181 (10th Cir. 2004)(emphasis deleted) (citation omitted)(cited pursuant to Tenth Cir. Rule 32.1). "Where prison officials prevent or thwart a prisoner from utilizing an administrative remedy [either by failing to respond to a grievance in a timely manner or by denying necessary grievance forms], they have

---

[6]OP-090124, Section I(E) defines "administrative review authority" as "[t]he director, chief medical officer, or their designee to whom the formal grievance is submitted for final appeal."

rendered that remedy 'unavailable' and a court will deem that procedure 'exhausted.'" Id. (citations omitted).

In determining whether the instant defendants are entitled to summary judgment, the Court has considered the following undisputed facts.

1. Thomas is an inmate in DOC custody, and he has been in DOC custody since January 1982. He is currently incarcerated at Lawton Correctional Facility in Lawton, Oklahoma.

2. The incidents giving rise to the instant lawsuit occurred while Thomas was incarcerated at JCCC in Helena, Oklahoma, and the instant defendants were at all relevant times either JCCC or DOC employees or officials.

3. The grievances involved in the case-at-bar were filed between October 4, 2008, and December 2, 2008.

4. Grievance JCCC-08-88

(a) Thomas submitted a Request to Staff dated September 26, 2008, to defendant Frech, JCCC Correctional Health Services Administrator ("CHSA").

(b) In the Request to Staff, Thomas wrote:

I have requested that I be prescribe[d] Omega 3 Fish Oil for my high cholesterol because of its effective use. Dr. Troutt alleges that it is for tryglicirides [sic] and not cholesterol. He is forcing me to take 1000 mg of Niacin. Niacin causes false positives in drug uranalysis [sic] test[s]. I tested positive for drugs although I never used drugs.

(c) In response, Frech wrote:

The doctor has prescriptive authority and will make all decisions of what medications will be written. He has the education and license to make the decision on what medications are best for you based on your medical examination.

7

(d) Thomas submitted an Inmate/Offender Grievance Report Form dated

October 4, 2008. He wrote:

> I sent . . . Frech . . . a Request to Staff September 26, 2008, complaining that Dr. Troutt prescribed Niacin to treat my high cholesterol and . . . that one of the terrible side effects of Niacin is that it causes false positives in drug uranalysis [sic] tests, and I tested positive for marijuana when I was on Niacin before although I have never smoked "weed." I will not lower my cholesterol significantly. . . . The only safe alternative is . . . Omega 3 Fish Oil.

(e) On October 6, 2008, Frech responded to the grievance:

> The medical provider has prescriptive authority and will make all decisions of what medications will be written. You are being provided equitable and appropriate health care services. If you have additional questions you may submit a Request for Medical Services to discuss any additional health concerns with the provider.

(f) Thomas complained of probable error committed by Frech and appealed

to defendant McCoy, DOC Medical Services Administrator. On November 18, 2008,

McCoy denied Thomas' appeal and his request that he "be put on Omega 3 Fish Oil to

lower . . . [his] cholesterol." She wrote:

> Pertinent information from your medical record was obtained and reviewed. According to your record, your physician has neither recommended nor prescribed Omega 3 Fish Oil.
>
> If you need further assistance with any health concerns, you must submit a "Request for Medical Services" form (attached) to the medical unit at your facility, via the sick call process.

(g) Thomas has completed the four-step grievance procedure outlined in OP-

090124 as to this claim, which is set forth in Count X of the amended complaint, and he

has exhausted his available administrative remedies as to this count.

5. Grievance JCCC-08-89

(a) On September 26, 2008, Thomas submitted a Request to Staff to Frech, wherein he stated:

> The continued, indifferent, calloused commissioned prescription medications of metoprolol, amlodopine [sic], and HCTZ to treat my medically induced hypertension [are] destroying my kidneys and causing constipation and cramps, and my kidney problems have still not been diagnosed or treated.

(b) Thomas requested "[i]mmediate diagnosis and treatment of this problem and the discontinu[ation] of these medications that are not helping . . . but hurting . . . ."

(c) Frech responded that same day by stating:

> The doctor has prescriptive authority and will make all decisions on what medications will be written. He has the education and license to make the decision on what medications are best for you based on your medical examination.

(d) On October 4, 2008, Thomas completed an Inmate/Offender Grievance Report Form and stated that he had "kidney damage," which he "learned" about "from Dr. Troutt [on] May 19, 2008." He complained that Dr. Troutt had "not suggested any treatment or diet" or "sent . . . [him] to a specialist." He further complained that Dr. Troutt had "made it worse" by among other things "continuing to prescribe these damaging drugs . . . ."

Thomas requested that he be sent to a renal specialist for diagnosis and treatment as well as to a "facility that has more than one doctor," "that has delivery of health services in [the] evening, at night, [and] on the weekend, for emergencies" and that "has more than zero physician assistants."

(e) Thomas' Inmate/Offender Grievance Report Form was returned to him with a memorandum dated October 13, 2008, from defendant Guffy, JCCC Warden's

9

Assistant. Guffy explained that the grievance was being returned unanswered for the following reasons:

> Grievance submitted out of time from date of incident or date of response to the "Request to Staff."

> Inmate/offender signature and/or date not affixed to grievance/Request to Staff.

> More than one issue or incident included. Only one issue or incident allowed per grievance/request to staff.

> Offender has indicated that the date of incident was May 19, 2008. Offender has 7 days from the date of incident to submit a[n] RTS. The RTS must have been submitted within 7 calendar days of the date of incident. The RTS attached is dated 9-26-08.

      (f) Guffy also advised Thomas that he had "ten calendar days from the date of receipt [of the memorandum] to properly resubmit . . . [his] grievance/Request to Staff, if allowed."

      (g) There is no evidence that Thomas resubmitted his grievance or that he appealed Guffy's response.

    6. <u>Grievance JCCC-08-90</u>

      (a) On September 10, 2008, Thomas submitted a Request to Staff to Dr. Troutt, wherein he stated:

> Currently you have prescribed to me for control of high blood pressure HCTZ, amlodipine and metoprolol. I strongly [believe] that my suffering from high blood pressure is a side effect of being overdosed continuously on drug cocktails. My blood pressure can be controlled with only HCTZ. When my blood pressure has soared out of control, it has been from stress, too many unneeded medication[s], traumatic episode precipitated by a cortisone shot, and the lingering traumatic episode precipitated by two bottles of sodium nitrate to help prep me for a colonoscopy from which I have not recovered.

(b) Thomas suggested to Dr. Troutt among other things that the "amlodipine and metoprolol be discontinued, monitoring be increased to three times weekly," and that his "progress be followed on HCTZ, exercise, and diet."

(c) Frech responded on September 23, 2008:

Mr. Thomas, you cannot self diagnose or self prescribe medications. You are being sent for a renal artery ultrasound and an echocardiogram at OU Medical Center which are both coming up very soon. Let the medical providers who have the knowledge, education and experience to treat you, decide what is the appropriate route to take in your plan of care.

(d) Thomas filed an Inmate/Offender Grievance Report Form on October 4, 2008, addressed to Frech, and he complained

that these cocktail[s] of high blood pressure medications (HCTZ, amlodipine, and metoprolol) . . . cause[ ] . . . my blood pressure [to] continue[ ] to be too high since it was intentionally made to[o] high in May 2008 by two bottles of prescribed sodium nitrate. This amlodipine and 100 mg of metoprolol ha[ve] made my stool too hard, increased cramps in legs, weakness in feet, and [have] damage[d] . . . my kidneys.

(e) Thomas requested that he be referred "to a qualified doctor" and that his hypertension and medications be managed "according to 'chronic illness management.'"

(f) Guffy returned Thomas' grievance, and in a memorandum dated October 13, 2008, she indicated the reasons for doing so:

Grievance submitted out of time from date of incident or date of response to the "Request to Staff."

More than one issue or incident included. Only one issue or incident allowed per grievance/request to staff.

Offender has not indicated a specific date but has indicated that the date of incident was May 2008. Offender has 7 days from the date of incident to submit a[n] RTS. The RTS must have been submitted within 7 calendar days of the date of incident. The RTS attached is dated 9-10-08.

(g) Guffy advised Thomas that

[g]rievances/Requests to Staff that do no comply with policy will be returned unanswered. You have ten calendar days from the date of receipt to properly resubmit your grievance/Request to Staff, if allowed.

(h) There is no evidence in the record that Thomas appealed Guffy's

response or that he resubmitted his grievance.

7. Grievance JCCC-08-96

(a) In a Request to Staff dated October 1, 2008, Thomas complained to

Frech:

I was refused medical care of an emergency medical issue Thursday night, September 25, 2008, at approximately 11:45 p.m. My damaged kidneys tried to shut down, causing excruciating pain and cramps to my feet and legs, temporarily crippling me. No staff came to my aid. No emergency person was summoned. No one has seen me yet. My life was in danger.

(b) The copy of the Request to Staff however submitted to the Court reflects

neither a date of receipt by JCCC Medical Services Administration nor, as it appears to be

an unsubmitted Request to Staff, a response from Frech.

(c) Thomas thereafter on October 21, 2008, completed an Inmate/Offender

Grievance Report Form[7] addressed to Frech. He wrote:

I was denied emergency health care at 11:45 p.m. 9-25-08 (Thursday) for a failing kidney. The duty officer refused to provide emergency care. I was on the floor of Unit 3 with excruciating pain, cramps in legs and feet, helpless. Four inmates tried to assist me, m[a]ssaging my legs and feet, giving me water, picking me up off the floor.

---

[7]In the Inmate/Offender Grievance Report Form completed by Thomas on October 21, 2008, Thomas advised that Frech had neither responded to this Request to Staff within the required time nor returned Thomas' original form. He indicated that the attached Request to Staff was a handwritten copy of the Request to Staff sent to French on October 1, 2008.

(d) Thomas also reported that he "[p]ut in a sick call request 9-26-08" but received "[n]o response . . . ." He asked that JCCC among other things

provide doctors, physician[ ] assistants, and nurses for emergency care 24 hours a day, seven days a week, answer sick call request[s] within 48 to 72 hours and emergency care immediately. . . .

(e) On October 23, 2008, Guffy returned Thomas' grievance unanswered with an explanation of why she was doing so:

No staff response affixed to the "Request to Staff."

Grievance submitted out of time from date of incident or date of response to the "Request to Staff."

More than one issue or incident included. Only one issue or incident allowed per grievance/request to staff.

(f) Thomas was again advised that he had "ten calendar days from the date of receipt to properly resubmit . . . [his] grievance/Request to Staff, if allowed."

(g) Thomas instead on October 24, 2008, appealed to DOC Medical Services Administration, and set forth in his appeal the events that occurred on September 25 and 26, 2008, an explanation regarding the Request to Staff, to which he had received no response, and the grounds identified by Guffy that prompted the return of his grievance unanswered.

(h) By letter dated November 26, 2008, McCoy responded and stated the reasons Thomas' original correspondence was being returned:

1. No staff response, signature or date affixed to the "Request to Staff" form.

2. A completed "Grievance Response from Reviewing Authority" report was not submitted.

3. "Request to Staff" not received within seven calendar days of the incident.

13

4. Grievance not received within 15 calendar days of the incident or date of the response to the "Request to Staff."

5. Attachment(s) included with grievance (1 additional page).

(i) McCoy advised Thomas that it was his "responsibility to properly submit . . . grievance correspondence in accordance with OP-090124" and that "[a] grievance restriction may be imposed . . . for any subsequent misuse and/or abuse of the grievance process." She further advised Thomas that if he "need[ed] further assistance with any health concerns, [he was required to] . . . submit a 'Request for Medical Services' form . . . , [d]ocument . . . [his] concerns on . . . [the attached] request form and submit it via the sick call process at . . . [JCCC]."

8. <u>Grievance JCCC-08-99</u>

(a) On October 20, 2008, acknowledging that he had already submitted a Request to Staff on this same issue, Thomas submitted a Request to Staff to Dr. Troutt and complained that as of that date:

> I am and have been suffering from cramps in my feet, legs as well as weakness in my feet from taking amlodipine prescription medication that I believe is damaging my kidneys. My complaint covers the period from 10-13-08 to 10-20-08, and it is continuous.

(b) He demanded that Dr. Troutt

> stop endangering my life by experimenting with this drug and send me to a specialist who will diagnose and prescribe the correct medication for one with a damaged kidney.

(c) Frech responded on October 28, 2009, by stating:

> Mr. Thomas, we have referred you to OU for a consultation. You went on 10-7-08 for a renal artery ultrasound and an echocardiogram. We are awaiting the results.

(d) On October 29, 2008, Thomas submitted an Inmate/Offender Grievance Report Form to Frech, wherein he again advised that he had previously submitted a grievance on this same issue, repeated his complaint as set forth in his Request to Staff and asked that he

> be sent to renal specialist, be taken of[f] amlodopine, be diagnosed and treated by special[ist], and have Killer Troutt taken off . . . [his] medical case.

(e) In a memorandum dated November 13, 2008, Guffy advised Thomas that she was returning his original grievance correspondence unanswered for the following reasons:

> More than one issue or incident included. Only one issue or incident allowed per grievance/request to staff.
>
> As the offender has indicated this issue has already been answered in JCCC-08-89. Getting an additional RTS about the same issue does not change the date of incident which as indicated by the offender was May 2008. This issue is out of time.

(f) Although he was advised in Guffy's memorandum that he had ten (10) calendar days to correct the deficiencies and to properly resubmit his grievance, Thomas instead appealed to McCoy. She responded by letter dated December 22, 2008, and stated that she was returning his original correspondence unanswered for the following reasons:

> 1. A completed "Grievance Response from Reviewing Authority" report was not submitted.
>
> 2. Attachment(s) included with grievance (1 additional page).

(g) McCoy also directed Thomas' attention to the grievance restriction letter he had received on December 10, 2008, and advised him that "[a]ny further misuse and/or abuse of the grievance process will be grounds for extending . . . [his] current restriction."

(h) In the letter dated December 10, 2008, to which McCoy referred and which was generated in connection with another grievance, JCCC-08-115, defendant Redman, JCCC Acting Warden, wrote:

Your grievance is being returned unanswered for the following reasons:

*The repeated submitting of grievances or "Requests to Staff" about an issue previously addressed by staff in their written response.

*The continued procedural defects, such as submitting additional pages, after having been previously warned.

OP-090-124 . . . , section IX, states in part,"The appropriate reviewing authority or medical deputy director may determine there is abuse or misuse of the grievance process, and may restrict the inmate's/offender's capacity to submit a grievance. The abuse may be, but is not limited to: a.) grievances intended to harass another; b.) the continual and repeated submitting of frivolous grievances; c.) the repeated submitting of grievances or 'Requests to Staff' about an issue previously addressed by staff in their written response; d.) grievances about de minimis . . . issues; e.) repetitive grievances by multiple inmates/offenders about the same issue; f.) an inmate/offender using letters and failing to bring complaints by formal grievance; and g.) continued procedural defects, such as submitting additional pages, after having been previously warned."

Previously, on 11-24, 2008, you were warned four times of grievance restriction. Apparently you did not take this warning as seriously as intended. Therefore, since you refuse to following the inmate/offender grievance process, I am placing you on grievance restriction from December 10, 2008 through December 10, 2009. You are required to follow steps outlined in Section IX of OP-090124 prior to submitting a grievance at any level. Keep in mind that further abuses are grounds for additional restriction.

9. Grievance JCCC-08-100

(a) On October 20, 2008, Thomas submitted a Request to Staff to Dr. Troutt, wherein he acknowledged that he had already submitted a Request to Staff on this same issue, and complained that

from 10-13-08 to 10-20-08, I . . . suffered leg cramps, feet cramps, weakness in the ball[s] of both feet, and damage to my kidneys from daily taking 100 mg of metoprolol over that period of time.

(b) He asked Dr. Troutt to refer him "to a specialist for diagnosis and treatment."

(c) On October 28, 2008, Frech responded by stating:

We have referred you to OU for a consultation. You went on 10-7-08 for a renal artery ultrasound and an echocardiogram. We are awaiting the results.

(d) On October 29, 2008, Thomas submitted an Inmate/Offender Grievance Report Form wherein he again acknowledged that he had previously submitted a grievance on this issue and again complained that

[f]rom 10-13-08 to 10-20-08, I . . . suffered from cramps in my legs, feet cramps, weakness in my feet from taking metoprolol, which I believe is damaging my kidneys.

(e) He again requested that he "[b]e sent to a specialist for diagnosis and treatment and be taken off metoprolol and out of the care of Dr. Troutt."

(f) Guffy returned Thomas' original grievance correspondence to him unanswered on November 13, 2008, and advised him of the reasons for the return of the documents:

More than one issue or incident included. Only one issue or incident allowed per grievance/request to staff.

As the offender has indicated this issue has already been answered in JCCC-08-89. Getting an additional RTS about the same issue does not change the date of incident which as indicated by the offender was May 19, 2008. This issue is out of time.

(g) Thomas was again advised that he had "ten calendar days . . . to properly resubmit . . . [the] grievance/Request to Staff . . . ." Thomas, instead, appealed to McCoy.

17

(h) By letter dated December 29, 2008, McCoy notified Thomas that she was returning his grievance correspondence to him for the following reasons:

> 1. A completed "Grievance Response from Reviewing Authority" report was not submitted.
>
> 2. Attachment(s) included with grievance (1 additional page).

(i) McCoy also referred Thomas to Redman's grievance restriction letter dated December 10, 2008.

10. <u>Grievance JCCC-08-101</u>

(a) On October 27, 2008, Thomas submitted a Request to Staff to Frech, wherein he complained of the following:

> Thirty-one (31) days after I requested emergency medical care for failing kidneys 9-26-08, deliberately indifferent Dr. Troutt saw me today 10-27-08 in a pretense of diagnosis of my claim without examining me.

(b) Thomas requested the following action be taken:

> Refer me to impartial, objective doctor for examination, blood test, liver test, kidney test. Take me off all high blood pressure medication except HCTZ. Provide me with actual, compensatory, and punitive damages for my injury and your failure to immediately respond to life-threatening emergency.

(c) No response appears on that Request to Staff, and on November 10, 2008, Thomas submitted an Inmate/Offender Grievance Report Form to Frech. Thomas reported:

> Deliberately indifferent Dr. Troutt saw me at an appointment on Oct. 27, 2008, that I tried to make Sept. 26, 2008, concerning an emergency kidney fail[ure]. He did not examine me 10-27-08, determine what was wrong, or prescribe any treatment.

(d) Thomas requested the following action be taken:

> Take deliberately indifferent Troutt off my health care provider list. Provide a caring compassionate health care provider. Provide examination,

diagnosis, informed analysis and suggested course of treatment. Provide me protection from retaliatory, vindictive treatment from Troutt designed to kill me.

(e) In a memorandum dated November 13, 2008, Guffy identified the reasons she was returning Thomas' grievance correspondence:

No staff response affixed to the "Request to Staff."

More than one issue or incident included. Only one issue or incident allowed per grievance/request to staff.

(f) Thomas was again advised that he had "ten calendar days . . . to properly resubmit . . . [the] grievance/Request to Staff . . . ." Instead, Thomas appealed to McCoy.

(g) McCoy by letter dated December 23, 2008, advised Thomas that she was returning his grievance documents to him unanswered for the following reasons:

1. A completed "Grievance Response from Reviewing Authority" report was not submitted.

2. Attachment(s) included with grievance (1 additional page).

(h) McCoy also referred Thomas to Redman's grievance restriction letter dated December 10, 2008.

11. On November 25, 2008, Thomas submitted a Request to Staff to defendant Parker, JCCC Warden. Acknowledging that he had already submitted a grievance on the same issue, Thomas wrote:

After I testified in a deposition Nov. 5, 2008, about the unconstitutionality of TBN and Three Angels Broadcast Television, you, Guffy, Denton, Gwinn, . . . Anderson, Redman, and Dowling incited the inmates against me Nov. 9, 2008, by threatening to prevent all inmates who don't own a T.V. from watching their bunkmate or cellmate's T.V. in retaliation against me, to try to get me hurt, or killed.

12. He requested the following actions be taken:

Stop bullying, retaliating against me, answer issue on merits, confess conduct, pay me damages.

13. Parker responded by memorandum dated December 1, 2008:

Your original appeal correspondence is being returned unanswered for the following reason(s):

> • As indicated in the Request to Staff the date of incident given by offender is 11-9-08. The offender has seven days from the date of incident to submit a Request to Staff. This issue is out of time. A request for monetary action is not addressed at the facility level. Only one issue is addressed per Request to Staff. Offender has requested five actions be taken.

> • The safety and security of all our offenders is a priority at this facility and within this agency. If you feel threaten[ed] please refer to ODOC OP 060106 regarding procedures for protective measures, or simply go to a staff member and request protective measures.

14. In an interoffice memorandum dated December 2008 and addressed to Parker, defendant Gwinn, JCCC Unit Manager, reported:

In accordance with your instruction, I met with . . . [Thomas] for purpose of investigation in regards to claims raised in . . . Request to Staff dated . . . 12/01/2008. In an attempt to explain Department Policy, Protective Measures Investigation, . . . [Thomas] became loud and voiced statements to the effect[ ] that he did not need protective custody; he was going to sue myself and the warden; he would see me in federal court[;] he was tired of the games.

15. Grievance JCCC-08-102

(a) In a Request to Staff dated November 3, 2008, and addressed to defendant Janet Dowling, JCCC Deputy Warden, Thomas wrote:

When I called Joyce Shipp, one of my first cousins, Sunday, Nov. 2, 2008, she informed me that my Aunt Carol Roland Wilson died October 27, 2008, and that Verena Hooks, my sister[,] called this facility to inform me and to try to make arrangements for me to view her remains. No member of JCCC staff informed me of my [aunt's] . . . death and I did not know until 11-02-08.

20

(b) He complained of the "cowardly, calloused, egregious, systemic pattern of retaliatory behavior perpetrated against . . . [him]."

(c) Dowling responded on November 4, 2008, by stating:

Please accept my condolences for your loss.

There is no cowardly, calloused, egregious, systemic pattern of retaliatory behavior being perpetrated against you.

(d) Thomas completed an Inmate/Offender Grievance Report Form dated November 11, 2008, and addressed to Parker. He complained about the events giving rise to the Request to Staff and wrote:

Because of the contempt for me by JCCC officials, they did not inform me of my aunt's death until after her funeral.

(e) He requested that he be informed of the date his sister called,

what she was promised, who received the call and who refused to answer and inform of my aunt's death, arrange through chapel for me to view any video made of my aunt's Nov. 1, 2008, funeral.

(f) By memorandum dated November 14, 2008, Thomas was advised by Guffy that his grievance correspondence was being returned unanswered for the following reasons:

More than one issue or incident included. Only one issue or incident allowed per grievance/request to staff.

Offender has requested five issue[s] be answered. Only on[e] issue per grievance is allowed.

(g) Thomas was advised that he had ten calendar days to resubmit his grievance; he instead appealed to McCoy, who returned his grievance on December 29, 2008, for the following reasons:

1. A completed "Grievance Response from Reviewing Authority" report was not submitted.

2. Attachment(s) included with grievance (1 additional page).

3. Other: (a) The nature of your concern involves a complaint against staff and/or a condition of confinement/not a medical issue. (b) Refer to your grievance restriction letter dated December 10, 2008.

16. Grievance JCCC-08-103

(a) On October 29, 2008, Thomas submitted a Request to Staff to Dowling,

wherein he complained:

> On October 23, 2008, . . . Guffy usurped the function of the Correctional Health Services Administrator ["CHSA"] in deciding Grievance JCCC-08-96 pursuant to OP-090124.V.A.7 instead of allowing . . . CHSA [Frech] to exercise her obligation to respond to my grievance pursuant to OP-090124.V.A.5.

(b) Thomas requested that Frech be allowed "to respond to nonfrivolous

grievance on the merits pursuant to OP-090124.VI.B.2 and OP-090124.VI.B.5."

(c) Dowling responded on November 3, 2008, by advising Thomas:

> Mrs. Guffy did not usurp the function of the CHSA . . . . Mrs. Guffy is the grievance manager as designated by Warden Parker and reviewed JCCC-08-96 in accordance with ODOC 090124. A cover sheet outlining the defects was attached. You have the opportunity to correct the defects and re-submit the grievance.

(d) On November 14, 2008, Thomas submitted an Inmate/Offender

Grievance Report Form to Parker and complained:

> Warden's Assistant . . . Guffy, a major defendant in two pending federal lawsuits, usurped the function of the Correctional Health Services Administrator in deciding my medical grievance JCCC-08-96 under OP-090124.V.A.7 instead of allowing . . . [Frech] to exercise her obligation to respond to my meritorious grievance according to OP-090124.V.A.5.

(e) Thomas further complained that he was being subjected to "retaliatory governmental interference."

(f) On November 18, 2008, Redman responded:

As designated by Warden Parker, Mrs. Guffy is the grievance manager. As such, it is her duty to review all grievances for procedural correctness. As evidenced by JCCC-08-88, if the grievances are procedurally correct, they are then forwarded to the proper respondent. JCCC-08-96 had several deficiencies as outlined on the cover letter that was attached. It is your responsibility to familiarize yourself with ODOC OP 090124 and submit grievances properly.

(g) Thomas appealed, and on December 29, 2008, McCoy responded and returned Thomas' documents for the following reasons:

1. Written comments affixed to the front page of the "Grievance Response from Reviewing Authority" form.

2. Other: (a) The nature of your concern involves a complaint against staff.
(b) Refer to your grievance restriction letter dated December 10, 2008.

17. On November 11, 2008, Thomas submitted an Inmate/Offender Grievance Report Form, which he labeled "Sensitive Grievance," to DOC Director Justin Jones. He wrote:

The defendants in Thomas v. Guffy, et al., CIV-07-823-W[,] hatched a plan Nov. 9, 2008, in retaliation for my raising the issues of TBN and Three Angels Broadcast Network in a deposition I gave on Nov. 5, 2008, designed to make other inmates . . . kill me because defendants are conducting a misinformation campaign among the inmates at JCCC to convince them that it is my fault that inmates without a T.V. at JCCC can no longer watch any other inmate's T.V. with him although inmates have always watched each other's T.V. . . . .

18. This grievance, numbered DOC-08-2620, was returned unanswered to Thomas by Debbie Morton, DOC Director's Designee, on November 18, 2008, because it was "[n]ot

of a sensitive/emergency nature," and Thomas was advised that he needed to "follow the standard grievance process including giving the facility an opportunity to respond."

19. Grievance JCCC-08-111

(a) On November 13, 2008, Thomas submitted a Request to Staff to Parker and complained therein:

> You are currently as of this date of 11-13-08 violating my 14th Amendment Right to Equal Protection by not providing me, who does not own a T.V., with a T.V. to watch in the dayroom of every JCCC unit like similarly situated inmates at all DOC and private facilities.

(b) Thomas requested that JCCC

> provide money from employee/inmate welfare fund to purchase televisions for all inmates who do not own televisions and place the televisions in every unit at JCCC.

(c) Dowling responded on November 18, 2008, by denying Thomas' request and stating: "Televisions are a privilege not a right."

(d) On November 25, 2008, Thomas completed an Inmate/Offender Grievance Report Form addressed to Parker and stated therein:

> As of 11-13-08, I am not provided with a television to watch in JCCC dayrooms, like similarly situated DOC inmates at Big Mac, Granite, Stringtown, LCC, JHCC, [and] DCCC and private facilities like Lawton, Cushing, and Holdenville, violating my 14th Amendment right to equal protection.

(e) On December 8, 2008, Guffy responded and advised Thomas that his grievance was being returned unanswered because "[g]rievances may not be submitted on the behalf of other offenders."

(f) Thomas was advised that he had ten (10) calendar days to resubmit his grievance; there are no documents that reflect that he did so.

24

20. Grievance JCCC-08-113

    (a) On November 9, 2008, Thomas submitted a Request to Staff addressed

to JCCC Unit Manager Gwinn. Thomas complained:

> At about 7 p.m. 11-9-08, [defendant] Lt. [William] Irvin[, a JCCC security
> officer,] visited [defendant] Shaw[, also a JCCC security officer,] on Unit 3
> and ordered him to inform me that I cannot watch my cell partner's television
> because it violates JCCC policies. Lt. Irvin is discriminating against me in
> retaliation for testimony I made in a deposition November 5, 2008.

    (b) Thomas requested Gwinn take the following actions:

> Stop all inmates at JCCC who do not have their own T.V. from watching any
> other inmate's T.V. Provide . . . [televisions] in all dayrooms at JCCC. Apply
> policies equally to all inmates at JCCC.

    (c) On November 24, 2008, Gwinn responded:

> Officers have been advised to enforce the rules across the board; you are
> not being singled out. In the capacity of Unit Manager, I do not directly
> supervise security officers; therefore, should you decide to continue this
> issue, file with the Chief of Security and not this office.

    (d) On November 24, 2008, Thomas filed an Inmate/Offender Grievance

Report Form addressed to Parker and stated therein:

> On 11-9-08, Warden Parker and Chief of Security Denton ordered Captain
> Reed to order Lt. Irvin and Unit 3 Officer Shaw to order me to not watch my
> bunkmate's T.V. because it violated a non-existent procedure. No other
> inmate on Unit 3 or JCCC (in cells and dorms) received that order. The . .
> . action was retaliatory discrimination against only me.

    (e) Thomas requested that Parker "[c]onfess actions" and "pay actual,

punitive, and compensatory damages" to him.

    (f) On December 8, 2008, Guffy advised Thomas that his grievance papers

were being returned unanswered for the following reasons:

> Requests for monetary damages are not addressed at the facility level.

Offender has requested several actions be taken[;] only one issue per grievance is permitted. As outlined by . . . Gwin[n] in his response, the RTS was not submitted to the appropriate staff member.

21. Grievance JCCC-08-114

(a) On November 5, 2008, Thomas completed a Request to Staff addressed

to Parker. He noted therein that a grievance, DOC-08-2620, had already been submitted

on the same issue. In the Request to Staff, Thomas complained:

> After I testified in a deposition Nov. 5, 2008, about the unconstitutionality of TBN and Three Angels Broadcast Television, you, Guffy, Denton, Gwinn, . . . Anderson, Redman, and Dowling incited the inmates against me Nov. 9, 2008, by threatening to prevent all inmates who don't own a T.V. from watching their bunkmate or cellmate's T.V. in retaliation against me, to try to get me hurt, or killed.

(b) Thomas requested Parker take the following actions:

> Stop bullying, retaliating against me, answer issue on merits, confess conduct, pay me damages.

(c) On December 2, 2008, Thomas completed an Inmate/Offender Grievance

Report Form addressed to Parker. He stated therein:

> Parker, . . . Guffy, . . . Redman, . . . Gwinn, . . . [and] Anderson . . . hatched a retaliatory plan Nov. 9, 2008, to try to get me killed by gullible inmates because DOC/JCCC are carrying out a propaganda campaign against me designed to make inmates believe they will not be able to watch cellmates or bunkmates' [televisions] . . . because of me.

(d) Thomas warned Parker, "[p]repare to go to trial in federal court for your

retaliatory behavior toward me."

(e) On December 10, 2008, Guffy returned Thomas' grievance papers

unanswered and advised him of the reasons such action was being taken:

> Not an issue that is grievable to the Oklahoma Department of Corrections (i.e., involves private prison, misconduct, pending litigation; not within or

26

under the authority and control of the Oklahoma Department of Corrections; no remedy is allowed).

Offender has indicated pending litigation on this issue. Matters that are in the course of litigation are not answered at the facility level.

22. Grievance JCCC-08-115

(a) On November 25, 2008, Thomas completed a Request to Staff addressed

to Dowling. He complained:

This morning at 6 a.m.[,] 11-25-08, the white Christian Warden and the white Christian food supervisors fed the predominantly Christian inmates a "special" Christian breakfast of Christian swine sausage while feeding me cholesterol-raising peanut butter, showing religious discrimination against me.

(b) Thomas requested Dowling take the following action:

When you feed your brother Christians a special swine meal, feed me a special meal of fried fish.

(c) Dowling responded on December 2, 2008:

OP-070202, section II.C., entitled Special Diets, states that "DOC will establish a modification of the master menu to provide alternate protein sources for any inmate unable to eat the regular protein source because of religious requirements. The alternative protein source will be the same as on the vegetarian diet." When I reviewed the master menu, I did not see fish listed on the vegetarian diet.

(d) On December 2, 2008, Thomas completed an Inmate/Offender Grievance

Report Form addressed to Parker. He stated therein:

The white Christian officials of this prison fed the predominant Christian inmates a special swine sausage breakfast 11-25-08 while serving me peanut butter substitute in violation of the fourteenth amendment's equal protection clause.

(e) Thomas requested that Parker take the following actions:

Purchase turkey sausage, or beef bacon or fish for the entire meat eating population instead of catering to Christians and discriminating against non-pork eaters, specially Muslims.

(f) On December 10, 2008, Redman advised Thomas that his grievance was being returned for the following reasons:

*The repeated submitting of grievances or "Request to Staff" about an issue previously addressed by staff in their written response[.]

*The continued procedural defects, such as submitting additional pages, after having been previously warned.

(g) Redman also imposed in this letter the grievance restriction, to which other JCCC officials hade referred in responding to Thomas' grievances.

As stated, the PLRA, prevents an action "with respect to prison conditions . . . by a prisoner confined in any jail, prison, or other correctional facility" from being brought "until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "To be 'available' under the PLRA, a remedy must afford 'the possibility of some relief for the action complained of,'" Williams v. Sirmon, 2009 WL 3403184 * 3 (10th Cir. 2009)(quoting Booth v. Churner, 532 U.S. 731, 738 (2001))(cited pursuant to Tenth Cir. Rule 32.1), and the record establishes that administrative remedies were available to Thomas, which if he had utilized them, would have afforded him the possibility of some relief.

Upon review, the Court finds that the defendants have met their burden as to this affirmative defense and shown that no genuine issue of material fact exists with regard to Thomas' exhaustion of all available administrative remedies as to Counts I, III, IV, VI, X, XII and XIV. To properly exhaust his administrative remedies, Thomas was required to "'complete the administrative review process in accordance with the applicable procedural rules'–rules that are defined not by the PLRA, but by . . . [DOC's] grievance process itself.

Jones, 549 U.S. at 218 (quoting Ngo, 548 U.S. at 88); id. (prison's requirements, and not PLRA, define the boundaries of proper exhaustion). In viewing the undisputed facts in the light most favorable to Thomas, the record clearly establishes that although Thomas' grievances were deemed deficient, he took no steps to remedy his defective submissions within the allowed time. Accordingly, the Court finds that Thomas failed to complete DOC's four-step grievance process as to his claims under the eighth and fourteenth amendments to the United States Constitution and his allegations concerning the cruel and unusual punishment and/or the denial of equal protection to which he had allegedly been subjected as set forth in

(a) Count I, wherein Thomas complained about Dr. Troutt's deliberately indifferent treatment of Thomas' kidney problems;

(b) Count III, wherein Thomas complained about the denial and/or absence of emergency medical care with regard to his failing kidneys;

(c) Count IV, wherein Thomas contended that Dr. Troutt's prescribed use of metoprolol was deliberately indifferent to Thomas' serious medical needs;

(d) Count VI, wherein Thomas complained about medical understaffing at JCCC and Dr. Troutt's deliberately indifferent medical care; and

(e) Count XII, wherein Thomas complained about his inability to watch his bunkmate's television due to the retaliatory actions of certain defendants after he testified during a deposition on November 5, 2008, in connection with another lawsuit, Thomas v. Guffy, No. CIV-07-823-W, about Trinity Broadcast Network and Three Angels Broadcast Network.

29

The record further establishes that Thomas has admitted that he did not complete DOC's four-step grievance process as to Count XIV. See Affidavit of Jerry L. Thomas (Doc. 58-2).

In reviewing Thomas' arguments that the defendants prevented him from exhausting his administrative remedies or that the defendants impeded his ability to timely submit his grievances and hampered his efforts to exhaust as well as Thomas' arguments that "special circumstances" were created that excused exhaustion,[8] the Court finds no genuine issue of fact material fact exists as to these matters.

Furthermore, the Court declines Thomas' invitation to review his many grievances to determine whether they are procedurally defective. As the United States Court of Appeals for the Tenth Circuit has stated, this Court is ""obligated to ensure that any defects in exhaustion were not procured from the action or inaction of prison officials.""" Williams, 2009 WL 3403184 *3 (quoting Escobar v. Reid, 240 Fed. Appx. 782, 784 (10th Cir. 2007)(quoting Aquilar-Avellaveda v. Terrell, 478 F.3d 1223, 1225 (10th Cir. 2007))). The Court, however, has "no obligation to examine each of the ODOC's denials of . . . [Thomas'] grievances to see whether each grievance was in fact flawed." Fields v. Stuchell, 511 F.3d 1109, 1112-13 (10th Cir. 2007)(citation omitted). Accordingly, the movants are entitled to summary judgment as to Counts I, III, IV, VI, XII and XIV.

---

[8]In particular, the Court further finds no evidentiary support has been advanced by Thomas as to his contention that "McCoy masterminded the dismissal of . . . [his] grievances from inception of his Request[s] to Staff[ ], grievances, and grievance appeals, by consulting with Frech, Anderson, Morton, and Guffy to prevent him from exhausting by looking past meritorious claims to concocted technical violations." Plaintiff's Response [Doc. 58] at 3, ¶ 7. Likewise, the Court finds no evidentiary support in the record that would create a genuine issue of material fact with regard to Thomas' allegations that "McCoy entered into a conspiratorial alliance," id. at 15, with other defendants in this action.

As to Count X, the defendants have conceded, and the record so establishes, that Thomas exhausted his administrative remedies with regard to this claim. See Grievance JCCC-08-88. The Court, as Magistrate Judge Purcell did, has examined the defendants' challenge to the merits of this count under Rule 56, F.R.Civ.P., since the parties submitted material outside the pleadings, and such materials have been considered by the Court. In so doing, the Court finds Thomas is not entitled to the relief he has requested in Count X.

The State of Oklahoma is obligated under the eighth amendment to the United States Constitution to provide medical care for its prisoners. E.g., Estelle v. Gamble, 429 U.S. 97, 103 (1976). Prison officials' "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the [e]ighth [a]mendment." Id. at 104 (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976) (joint opinion)).

"'Deliberate indifference' involves both an objective and a subjective component. The objective component is met if the deprivation is 'sufficiently serious.'" Sealock v. Colorado, 218 F.3d 1205, 1209 (10th Cir. 2000)(quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994). "The subjective component is met if a prison official 'knows of and disregards an excessive risk to inmate health or safety.'" Id. (quoting Farmer, 511 U.S. at 837).

Thus, to prevail on his claim under the eighth amendment, Thomas must first show the existence of a "'sufficiently serious,'" Farmer, 511 U.S. at 834 (further quotation and other citations omitted), medical need. In this connection, "[a] medical need is sufficiently serious 'if is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's

attention.'" Sealock, 218 F.3d at 1209 (quoting Hunt v. Uphoff, 199 F.3d 1220, 1224 (10th Cir. 1999)(further quotation omitted)).  Thomas must then also establish that the defendants named in Count X had "a 'sufficiently culpable state of mind.'"  511 U.S. at 834 (citations omitted).  "[T]hat state of mind is one of 'deliberate indifference' to . . . [Thomas'] health or safety."  Id. (citations omitted).

Thomas has asserted in Count X that the "[p]rescription of Niacin by Dr. Troutt is deliberately indifferent" and that Dr. Troutt's decision to prescribe Niacin, or B12, to treat Thomas' cholesterol condition caused harm because such medication "will not lower [his] . . . cholesterol," because it causes "false positive[ ]" drug urinalysis test results as well as side effects, including muscle fatigue, liver/kidney damage and constipation and because it puts him at risk of having a stroke.

As the record demonstrates, Thomas has simply disagreed with Dr. Troutt's decision to treat Thomas' cholesterol condition with a vitamin supplement.  "[A] mere difference of opinion between the prison's medical staff and the inmate as to the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment." Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir.1980)(citation omitted).

There is no support in the record for Thomas' complaints about side effects related to his ingestion of Niacin that creates a genuine issue of material fact with regard to a serious medical need; likewise, there is no evidence that the prescribed supplement created a substantial risk of serious harm to his health.

Thomas' claim of alleged deliberate indifference under the eighth amendment that is based on Dr. Troutt's decision to prescribe Niacin likewise fails because Thomas has not established a genuine issue of material fact with regard to any defendant's knowledge that

his or her actions would pose a substantial risk of serious harm to Thomas.[9] E.g., Martinez v. Beggs, 563 F.3d 1082, 1089 (10th Cir. 2009)(prisoner must show defendant knew he faced substantial risk of harm and disregarded it by failing to take reasonable measures to abate it). Mere allegations that a particular defendant provided ineffective and/or even negligent treatment will not support a claim under the eighth amendment. E.g., Grassi v. Corrections Corporation of America, 2009 WL 4117352 *3 (10th Cir. 2009)(cited pursuant to Tenth Circuit Rule 32.1).[10] A defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. Absent a genuine issue of material fact as to the objective as well as the subjective prong of the deliberate indifference standard set forth in Farmer, the Court finds the defendants are entitled to summary judgment in their favor on Count X.

The final matter before the Court pertains to Roy Arian, who is identified as a JCCC physician assistant. Arian was named as a defendant in Thomas' amended complaint, but

---

[9]Thomas has argued that his ingestion of Niacin will yield "false positive" results after a drug urinalysis test, and that it has already done so at a prior institution. In his response to the defendants' Motion to Dismiss/Motion for Summary Judgment, Thomas submitted an affidavit, see Doc. 58-2, wherein he alleged that he would "be able to prove that . . . [he] was written up and convicted of smoking marijuana" after "taking prescribed Niacin pills . . . three times a day . . . ." There is no evidence in the record except Thomas' self-serving statements and certainly, no genuine issue of fact has been established, that Thomas' use of Niacin caused false positive results after a drug urinalysis test or more important, that Dr. Troutt, or any other defendant, knew or, and disregarded, an excessive risk to Thomas' health or safety in this regard and that his actions, or the actions of any other defendant, would subject Thomas to a substantial risk of serious harm. E.g., Farmer v. Brennan, 511 U.S. 825, 837 (1994).

[10]Thomas has complained that Dr. Troutt's "repeated negligence . . . eventually became deliberate indifference when . . . [he] recklessly chose to callously pursue an unscientific approach to prescribing a medication that he knew would not lower plaintiff's cholesterol over one that had proven to successfully lower [plaintiff's] . . . cholesterol." Objections to Supplemental Report and Recommendation [Doc. 62] at 8.

he has never been served. See Doc. 41. Accordingly, the Court concurs with Magistrate Judge Purcell's suggestion that Arian be dismissed from this action without prejudice.

Based upon the foregoing, the Court

(1) ADOPTS the Supplemental Report and Recommendation[11] [Doc. 61] issued on October 26, 2009, by Magistrate Judge Purcell;[12]

(2) GRANTS for the reasons stated herein the defendants' Motion to Dismiss/Motion for Summary Judgment [Doc. 46] filed on July 24, 2009, as to Counts I, III, IV, VI, X, XII and XIV and FINDS that defendants Anderson, McCoy, Clepper, Shaw, Parker, Chester, Troutt, Redman, Denton, Gwinn, Guffy, Frech, D. Frech, Myers, Irvin and Deweese are entitled to judgment as a matter of law on said counts;

(3) DISMISSES this matter without prejudice as to defendant Arian; and

(4) because all claims and causes of action asserted by Thomas in this matter have been resolved as to all defendants, ORDERS that judgment issue forthwith.

ENTERED this *18th* day of February, 2010.

LEE R. WEST
UNITED STATES DISTRICT JUDGE

---

[11]The defendants had contended that the case-at-bar should be deemed frivolous and dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(i). Magistrate Judge Purcell declined to make such a finding. The defendants were advised of their right to object to the Supplemental Report and Recommendation; they did not do so. Accordingly, the Court has not reconsidered that issue.

[12]In his Objection to Supplemental Report and Recommendation, Thomas has argued that Magistrate Judge Purcell should have recused himself in this matter. The Court again "finds that Thomas has advanced no grounds that would require Magistrate Judge Purcell to disqualify himself . . . ." Doc. 60.